STATE of Wisconsin, Plaintiff-Respondent,

v.

Dennis D. LEMOINE,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2010AP2597–CR. Oral argument October 4, 2012.
—Decided January 8, 2013.*

2013 WI 5

(Also reported in 827 N.W.2d 589.)

173

For the defendant-appellant-petitioner, there were briefs filed by *Katie R. York,* assistant state public defender, and oral argument by *Katie R. York.*

For the plaintiff-respondent, the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals[1] that affirmed the judgment of the circuit court. This case involves statements made during what was undisputedly a non-custodial interrogation of defendant Dennis D. Lemoine. The issue before this court is whether the statements were involuntary. If the statements were involuntary, the next appropriate step is to determine whether the state has proved beyond a reasonable doubt that the admission of the unconstitutionally obtained statements did not impel Lemoine to testify in order to overcome their impact at trial.[2]

¶ 2. Lemoine challenged the statements prior to trial on the grounds that they were involuntary. The circuit court for Sauk County, the Honorable Guy Reynolds presiding, reviewed a video recording of the interrogation, found that Lemoine's statements were voluntary under the totality of the circumstances, and allowed admission of the statements at trial. Lemoine then testified at trial and was convicted. He appealed on the grounds that the statements were involuntary and were thus improperly admitted. The court of appeals assumed without deciding that the statements were involuntary but held that in light of the other evidence produced at trial, including the defendant's testimony, the admission of the statements was harmless error. The court of appeals denied Lemoine's motion for reconsideration.

---

[1] *State v. Lemoine,* No. 2010AP2597, unpublished slip op. (Wis. Ct. App. Sept. 15, 2011).

[2] That determination is made under the standards set forth in *Harrison v. United States,* 392 U.S. 219 (1968), and *State v. Anson,* 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776; a discussion of these cases is contained in ¶ 35–36, *infra.*

¶ 3. We hold that the admission of Lemoine's statements at trial was not error because, under the totality of the circumstances, the statements were voluntary. The well-established test for voluntariness balances the personal characteristics of the defendant against pressures imposed by law enforcement officers to determine if the pressures exceeded the defendant's ability to resist. *State v. Clappes,* 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987). Nothing about Lemoine made him particularly vulnerable; he was 22 years old, had earned a high school equivalency diploma (HSED), held a job as a truck driver, was familiar with one of the interviewing officers, and was assertive enough to voice his discomfort with a female officer's presence, a concern the police accommodated. The interrogator overstated the evidence against Lemoine and provided Lemoine with incentives to give information, including a promise that Lemoine would not be jailed for the night if he told the "true story." When balanced, however, against the characteristics of Lemoine, the tactics used by the police in the 75 to 80 minute interrogation did not rise to the level of being coercive. Therefore, it was not error for the circuit court to admit the voluntary statements at trial. Accordingly, though our analysis differs from that of the court of appeals, we affirm its decision.

## I. BACKGROUND[3]

¶ 4. On the morning of April 23, 2007, Lemoine visited a friend at his friend's house. Lemoine's friend's five-year-old daughter, Caitlin B., returned home from Head Start and wanted to jump on the trampoline in

___

[3] The following facts are taken from trial testimony and exhibits.

the backyard. Lemoine offered to go with her and watch her, and he sat on the steps on the back porch while watching Caitlin. At some point, Caitlin came to Lemoine and sat on his lap.

¶ 5. Four days later, Caitlin told her parents that while she was sitting on Lemoine's lap on April 23 he "pulled her dress up and pulled down her underwear and put his finger in her pee-pee." Caitlin's mother reported the incident to the Sauk County Sheriff's Department, and on April 29, Caitlin underwent a sexual assault exam at Meriter Hospital in Madison. The next day, Detective Stacy McClure interviewed Caitlin. McClure asked Caitlin repeatedly if she had been given a "bad touch," and initially, Caitlin did not implicate Lemoine. After a ten-minute break during which Caitlin had contact with her mother, Caitlin told McClure that Lemoine pulled down her underwear and touched her "pee-pee."

¶ 6. Later that day, McClure called Lemoine and requested that he come to the sheriff's department. Lemoine arrived about an hour later. Initially, McClure interviewed Lemoine alone; she was later joined by Lieutenant Michael Stoddard. The interview, which lasted 75 to 80 minutes, took place in a small, windowless office at the sheriff's department and was recorded. No one advised Lemoine of his *Miranda*[4] rights or told him he was free to leave. At one point, when Lemoine's phone made a sound, Stoddard told Lemoine he could answer it.

¶ 7. No one argues that coercive conduct took place during the first 45 minutes of the interview. During that time, Lemoine stated that he had stopped by Caitlin's parents' house on the day in question and that he watched Caitlin bounce on her trampoline

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

briefly until he walked away "because it was boring." Lemoine repeatedly denied that Caitlin sat on his lap or was alone with him. When told that Caitlin claimed to have sat on his lap, Lemoine said that Caitlin "doesn't tell the truth" and was a troubled child so he "avoid[s] her at all costs." He further said that Caitlin had hit him in the back of the head with a chair once and had "smacked" him with wrenches.

¶ 8. After a break during which McClure briefly left the room, Stoddard joined the interview. Stoddard told Lemoine that he did not believe his story and that, if he would "come clean," the officers could help him out "by not making a big production in the [newspaper]." Stoddard also told Lemoine that Caitlin had just "gone through some very lengthy medical procedures" and that they were awaiting the results. Stoddard said, "I don't think it's going to look good for you when" the test results come in. Lemoine asked how many years of incarceration he would face if he admitted to the allegations, to which Stoddard replied that he did not know, but that the crime was a felony. Lemoine expressed concern that he would be unable to continue working as a truck driver with a felony conviction, but Stoddard assured him that a felony conviction would not prevent him from driving a truck.

¶ 9. Stoddard described three different scenarios: "We can arrest you and put you in jail, and you will go to court tomorrow. We give you a citation and send you down the road. Or we can do nothing and wait until we've got everything." Lemoine requested a citation to which Stoddard replied, "No. I'm not going to give you the choice." At that time, Lemoine voiced his discomfort with having McClure present, and she left the room. Lemoine stated, "I'm comfortable with you." Later, Lemoine asked what a felony and citation were, and

Stoddard explained that with a citation, Lemoine could ask for time to get his affairs in order and come back to make an initial court appearance at a later date, whereupon he would enter a plea and say "I'm not guilty of this."

¶ 10. Stoddard also promised Lemoine that if Lemoine gave the "true story . . . today" he would not "spend the night in jail" and that this would "give you time to call an attorney . . . [o]therwise, you know, we can lock you up, if we choose to do so." Stoddard explained that in jail Lemoine would not "be able to make any phone calls or anything." Stoddard then encouraged Lemoine to talk to the district attorney so that "it doesn't end up in court" or "in the public forum." Lemoine said that he would admit to the allegations if Stoddard would promise in writing that he would not be taken to jail.

¶ 11. Lemoine then explained that when he was sitting on the back porch, Caitlin jumped onto his lap and that as he picked her up from his lap he placed his hand on her private area and rubbed the area over the underwear for "10, 15 seconds." After repeatedly denying to Stoddard that there was skin-to-skin contact, he eventually admitted that there was. Lemoine characterized the incident as "the stupidest thing I've ever done" and said that he "almost wrecked" his motorcycle on the way to the police station because he knew why he was being called in. Later, during a break in which he was alone in the interview room, he said to himself, "I can't believe I did this." Lemoine was issued a citation and released. He was subsequently charged with first degree sexual assault of a child in violation of Wis. Stat. § 948.02(1)(e).[5]

---

[5] The court of appeals noted an error in the judgment of conviction; the judgment of conviction stated that "Lemoine was found guilty of Wis. Stat. § 948.02(1)(b), sexual intercourse with

¶ 12. Prior to trial, Lemoine moved to suppress the statements as coerced and therefore inadmissible.[6] The circuit court reviewed the video and the transcript of the interview, received briefing and decided at a hearing that the statements were voluntary.[7] Portions of the video were admitted at trial, and Lemoine testified. A jury found Lemoine guilty after a four-day trial.

¶ 13. Lemoine appealed the conviction on the grounds that his statements were involuntary and therefore wrongfully admitted at trial. The court of appeals affirmed the conviction by assuming without deciding that the statements were involuntary and then finding the admission of the statements to be harmless error. Lemoine moved for reconsideration for failure to conduct a *Harrison/Anson* analysis, and the court of appeals denied it, stating, "we have already addressed and rejected Lemoine's *Harrison* argument by holding that an error was harmless. Nothing in the materials submitted causes us to reconsider our decision." *State v. Lemoine,* No. 2010AP2597, unpublished slip op. (Wis. Ct. App. Oct. 13, 2011). Lemoine petitioned this court for review, which we granted.

a person who has not attained the age of twelve years, when, in fact, he was found guilty of violating § 948.02(1)(e), sexual contact with a person who has not attained the age of thirteen years." *State v. Lemoine,* No. 2010AP2597, n. 1, unpublished slip op. (Wis. Ct. App. Sept. 15, 2011). The court of appeals, consistent with *Roberts v. State,* 41 Wis. 2d 537, 547, 164 N.W.2d 525 (1969), modified the judgment to reflect the correct statutory violation. *Id.*

[6] Lemoine concedes that he was not in custody and therefore acknowledges that the statement was not obtained in violation of *Miranda,* 384 U.S. 436, which requires police to give certain warnings prior to custodial interrogations.

[7] The circuit court made its determination after having the benefit of watching a video of the interrogation.

180

## II. STANDARD OF REVIEW

¶ 14. This case presents an opportunity to apply our case law on voluntary statements and determine whether, under the totality of the circumstances, a statement was made voluntarily and is admissible against a defendant. The due process test of voluntariness "takes into consideration the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States,* 530 U.S. 428, 434 (2000) (citations omitted). A statement is voluntary if the pressures exerted by the police do not exceed the defendant's ability to resist. *State v. Clappes,* 136 Wis. 2d at 236. The State must show voluntariness by a preponderance of the evidence. *Lego v. Twomney,* 404 U.S. 477, 489 (1972); *State v. Jerrell, C.J.,* 2005 WI 105, ¶ 17, 283 Wis. 2d 145, 699 N.W.2d 110.

¶ 15. Motions to suppress evidence on constitutionality grounds are reviewed by this court with a two-prong analysis. *State v. Felix,* 2012 WI 36, ¶ 22, 339 Wis. 2d 670, 811 N.W.2d 775. "First, we review the circuit court's findings of historical fact, and will uphold them unless they are clearly erroneous. Second, we review the application of constitutional principles to those facts de novo." *Id. See also State v. Hoppe,* 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407.

## III. ANALYSIS

¶ 16. No one disputes the findings of historical fact made by the circuit court, so we turn to the determination of whether Lemoine's statements were voluntary.

181

## A. Voluntariness of Lemoine's Statements

¶ 17. Where a defendant raises a voluntariness challenge, the State must prove by a preponderance of the evidence that the statements made by the defendant were voluntary. *Jerrell C.J.,* 283 Wis. 2d 145, ¶ 17. If involuntary statements were admitted at trial, the admission could violate due process rights. *Rogers v. Richmond,* 365 U.S. 534, 540 (1961), *see State v. McManus,* 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989). "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *Hoppe,* 261 Wis. 2d 294, ¶ 36 (citations omitted).

¶ 18. We make the determination in light of all of the facts surrounding the interview and decided under the totality of the circumstances, balancing the defendant's relevant personal characteristics with the pressures imposed by the police. *Id.,* ¶ 38. This Court described the test in detail in *Hoppe.*

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure

brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.,* ¶ 39 (citations omitted).

¶ 19. The parties disagree on the application of the facts to that test. Lemoine asserts that his personal characteristics make him susceptible to police pressure because he was young, inexperienced with police, and desperate to keep his job and to stay out of jail. He also asserts that the interrogation tactics amounted to co-ercive police conduct. Lemoine specifically points to five things: (1) the promise not to put Lemoine in jail in exchange for the "true story," (2) the statement that Stoddard can help Lemoine out by keeping the case out of the papers and the "public forum," (3) the statement that Lemoine cannot make phone calls in jail, implying a restriction on contacting an attorney, (4) the exag-geration of the evidence against Lemoine, and (5) the failure to advise Lemoine of his *Miranda* rights. Lem-oine argues that the totality of the circumstances test is not a checklist of factors taken individually; instead, certain things, like the characteristics of the defendant, may increase the coercive influence of other tactics. Here, Lemoine argues that under the totality of the circumstances, the police tactics overcame Lemoine's ability to resist and made it impossible for Lemoine to make statements representing his free and uncon-strained will.

¶ 20. The State argues that Lemoine's statements were voluntary under the totality of the circumstances. It argues that the relevant personal characteristics of Lemoine show that at the time of the interview, he was not particularly vulnerable. He was an adult, he held a

good job, and despite dropping out of high school, he was intelligent enough to have earned an HSED. During the interview he was alert and appreciated the significance of the questioning, and he had previous encounters with police. The State argues that the officer's promise of not spending the night in jail was kept, *Miranda* warnings were not required because Lemoine was not in custody, the comment about limited phone access was not patently untrue, and using deception in an interrogation is common and generally acceptable; balanced against Lemoine's characteristics, Stoddard's conduct was not so coercive that it overcame Lemoine's ability to resist.

¶ 21. Applying the standard as laid out in *Hoppe,* we look first to the characteristics of the defendant and then to the tactics used by the police. As we have noted previously, the circuit court's findings indicate that Lemoine was not a vulnerable person. He was nearly 23 years old at the time of the interview. He did not graduate from high school, but the year he dropped out of high school he earned a high school equivalency diploma (HSED). Lemoine had a job as a truck driver. During the interview, Lemoine asked relevant questions that revealed that he was tracking the interview. Lemoine did not have any limitations physically or emotionally. He stated during the interview that he had not slept since the previous day, but the circuit court judge, who watched a videotape of the interview, found him to be alert at all times during the questioning with no signs of impairment. Lemoine asserts that he was very afraid of jail and losing his job, which impacted his emotional state, but the circuit court found that "if Lemoine had some internal coercion or pressures going on they were not made known to the detectives," and that he "appeared basically at ease and filled with energy."

184

¶ 22. Lemoine's previous experience with law enforcement is another relevant characteristic in the determination of voluntariness. *See Hoppe,* 261 Wis. 2d 294, ¶ 39. The circuit court found that Lemoine had no prior "experience with law enforcement in the criminal justice system, but he had some passing, at least, acquaintance with court proceedings insofar as a friend's court appearance or acquaintance's court appearances." During the questioning, Lemoine made repeated references to being a "felon" and also talked about a person he knows who went to jail for molesting kids who is now "on that list that they have," presumably referring to Wisconsin's sex offender registry, showing some familiarity with the criminal justice system.

¶ 23. Lemoine's personal characteristics did not make him vulnerable to police pressures. While he did not have extensive interaction with the criminal justice system, he certainly had some familiarity with the system. He was educated and held a good job, and he remained actively engaged throughout the interview. We have held that certain characteristics make defendants particularly vulnerable like minors (*Jerrell C.J.,* 283 Wis. 2d 145, ¶ 6, finding involuntary a written confession of a 14–years-old in eighth grade) and those in the hospital receiving treatment (*State v. Hoppe,* 261 Wis. 2d 294, ¶ 27, finding involuntary statements made by a defendant described as dehydrated, vomiting, suffering from tremors and hallucinations, lethargic, with slurred speech, difficulty tracking questions and low blood sugar). *See also Spano v. New York,* 360 U.S. 315, 321–22 (1959) (finding involuntary statements made by a defendant who had only one-half year of high school and had a history of emotional instability).

Lemoine had none of the characteristics of a defendant who was as vulnerable as those persons.

¶ 24. The characteristics of the defendant must be balanced against tactics used by police. *Clappes,* 136 Wis. 2d at 236. Lemoine was subjected to a noncustodial interrogation that lasted about 75 to 80 minutes. The police officers took two breaks, leaving Lemoine alone during those breaks. The interview took place in the sheriff's department in a small room. At times, two detectives questioned Lemoine. Neither of them told Lemoine he was free to leave. The door was closed, but Lemoine was seated closest to the door. Both Lemoine and Stoddard had their phones turned on during the interrogation. Stoddard answered his phone at least once, and when Lemoine's phone made a noise, Stoddard told him he could answer it. At one point, Lemoine said he was uncomfortable with the female detective, McClure; she promptly left. Lemoine then stated that he was comfortable with Stoddard with whom he had had some prior contact. There was no indication of physical or significant psychological pressure placed on Lemoine. Those interviewing Lemoine spoke in normal tones of voice. These facts do not demonstrate inappropriate police pressure or tactics.

¶ 25. We turn next to the inducements, threats, and lack of information given to the defendant about his rights. The police made some promises or at least provided incentives for telling them what they wanted to hear, including agreeing to keep Lemoine out of jail for the night.[8] The police also indicated that if Lemoine was put in jail, he would be cut off from communication,

---

[8] The circuit court found unreasonable Lemoine's belief that he would not be jailed at all but found that a promise of not being jailed that particular night was made by Stoddard.

including, by implication, communication with a lawyer. It is true that Lemoine was not informed of his right to counsel or his right against self-incrimination. As the circuit court found, this case would have been much easier if the interviewers had given Lemoine such warnings; however, Lemoine concedes that such *Miranda* warnings apply to custodial interrogations, and he makes no argument that he was in custody or that they were required here.

¶ 26. Lemoine was not particularly vulnerable, and therefore, the conduct of the officers was insufficient to overcome Lemoine's ability to resist. The tactics complained of were not anywhere near as harmful as Lemoine asserts.

¶ 27. First, the inducements offered by the police were not sufficient to make the statements involuntary. This court examined promises made during interviews in *State v. Owens,* 148 Wis. 2d 922, 436 N.W.2d 869 (1989). In *Owens,* the police promised a defendant they would consolidate charges in multiple counties to one county in exchange for cooperation.[9] *Id.* at 925. This Court found, "[a]lthough a promise was made to the defendant, it was fulfilled. Therefore, it was not part of an impermissible, coercive police tactic which could have rendered the confession involuntary." *Id.* at 931.

¶ 28. Here, the circuit court made a finding that the promise made was a promise not to spend that night in jail. Stoddard stated, "If we get the true story on you today, I'll see to it that you don't spend the night in jail, okay?" This promise was kept, and Lemoine did not go to jail that night. Consistent with *Owens,* this kept

---

[9] The defendant also argued that the police promised to consolidate all charges into a single charge, but the circuit court found that no such promise was made. *State v. Owens,* 148 Wis. 2d 922, 925, 436 N.W.2d 869 (1989).

187

promise was not coercive.[10] The State cites several cases from other jurisdictions in which similar promises were made and subsequent statements were found to be voluntary.[11] It is not automatically unduly coercive to promise a benefit to a suspect in exchange for cooperation. *See State v. Cydzik,* 60 Wis. 2d 683, 692, 211 N.W.2d 421 (1973). Stoddard's promise to Lemoine is not the type of promise that would reasonably overcome the ability of a suspect like Lemoine to resist.

¶ 29. Second, Lemoine exaggerates the consequences of Stoddard's offer to keep the case out of the public forum and the papers in exchange for cooperation. Stoddard stated that they would not make a "big production" in the papers if Lemoine cooperated. There is no evidence that Stoddard did anything to get media involved in this case. Even if Stoddard's statement was a conditional promise, Stoddard kept his promise so the statement does not weigh against voluntariness here. *See Owen,* 148 Wis. 2d at 931. Also, Stoddard suggested

[10] This is not to say that there could never be a situation in which a promise that was kept would, in the totality of the circumstances, be coercive enough to overcome a defendant's ability to resist, but in this situation, the promise was not. The State recognized that keeping a promise is not always dispositive when it stated, "[w]hile keeping such a promise may not necessarily conclude the voluntariness inquiry, it is an important factor that supports a determination of voluntariness." Resp. Br. at 11.

[11] *State v. Silva,* 674 P.2d 443, 447, 450 (Idaho Ct. App. 1983), *State v. Jungbauer,* 348 N.W.2d 344, 346 (Minn. 1984), *State v. J.G.,* 619 A.2d 232, 239–40 (N.J. Super. Ct. App. 1993), *People v. Van Kuren,* 767 N.Y.S.2d 323, 324 (N.Y. App. Div. 2003), *Commonwealth v. Templin,* 795 A.2d 959, 966–67 (Pa. 2002), *United States v. Male Juvenile,* 121 F.3d 34, 42 (2d Cir. 1997), *United States v. Ferrara,* 377 F.2d 16, 17–18 (2d Cir. 1967); Resp. Br. at 10–11.

that cooperating with the district attorney would keep this case out of court and out of the public forum – which is true to an extent. Agreeing to a plea limits the number of court appearances in a case, essentially keeping the case out of the public forum much more than otherwise might occur.

¶ 30. Third, Lemoine complains of Stoddard's implication that if Lemoine went to jail he would be cut off from communication, including communication with a lawyer. Stoddard implied that not going to jail that day would "give you time to call an attorney . . . [o]therwise, you know, we can lock you up, if we choose to do so." Stoddard explained that in jail Lemoine would not "be able to make any phone calls or anything." Lemoine cites *State v. Ward,* 2009 WI 60, 318 Wis. 2d 301, 767 N.W.2d 236, for the proposition that holding someone without allowing them to contact an attorney is constitutionally forbidden. In *Ward,* an officer told the suspect that she could not make any phone calls while in custody. *Id.,* ¶ 6. After an hour and forty minutes, police told her that this prohibition did not apply to attorney phone calls. *Id.* The majority of the court held that the circumstances did not destroy the voluntariness of the confession because the violation did not last long enough to warrant suppression.[12] *Id.,* ¶ 54. The court stated that it is constitutionally impermissible to hold an individual in custody without allowing him or her to contact an attorney. *Id.,* ¶ 52. However, misrep-

---

[12] Justice Crooks dissented, joined by Chief Justice Abrahamson and Justice Bradley, on the grounds that, despite Ward's characteristics weighing toward voluntariness, the tactics used by police including holding Ward incommunicado for over 24 hours made Ward's statements and reenactments involuntary. *State v. Ward,* 2009 WI 60, ¶ 75, 318 Wis. 2d 301, 767 N.W.2d 236 (Crooks, J., dissenting).

resentations by police "do not necessarily make a confession involuntary"; rather, they are a relevant factor in the totality of the circumstances. *Id.,* ¶ 27. Lemoine argues that *Ward* forbids Stoddard from saying phone calls were limited in jail, especially because unlike in *Ward,* Lemoine was never told that attorney phone calls are allowed from jail. The State distinguishes *Ward* because Ward was actually in custody whereas Lemoine was not in custody.

¶ 31. In light of the majority holding in *Ward,* the statements made by Stoddard were not themselves a constitutional violation in this case because Lemoine was not in custody. This is not a situation like *Ward.* The entire time that officers questioned Lemoine, he had access to his cell phone, and he was explicitly informed that he could use it. Stoddard made a misstatement when he did not clarify that attorney phone calls were allowed in jail, but in general, it is reasonable to view Stoddard's comments as an explanation that taking care of things outside of jail is easier. Because the comments were technically a misrepresentation, they weigh toward a finding of involuntariness, but in the context of the whole interview, they do not suffice to make Lemoine's statements involuntary.

¶ 32. Fourth, exaggerations of evidence against a defendant are the least coercive police deceptions because they can be countered with the knowledge of the person being questioned. *State v. Triggs,* 2003 WI App 91, 264 Wis. 2d 861, 663 N.W.2d 396, stated:

> Of the numerous varieties of policy trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary . . . Inflating evidence of [the defendant's] guilt interfered little, if at all, with his "free and deliberate choice" of

whether to confess, for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent.

*Id.,* ¶ 19 (citations omitted). Here, the detectives stated that extensive tests had been done and that it probably would not look good for Lemoine when the results came in. This information would not have caused Lemoine to make an involuntary statement because Lemoine could check any exaggerations with his own memory of the event and determine whether the interviewer was lying.

¶ 33. Finally, no one in this case disputes that *Miranda* warnings were not given to Lemoine. Lemoine argues that the lack of *Miranda* warnings exacerbate the other tactics used by the police under the totality of the circumstances. It is true that in this case, *Miranda* warnings were not required, but the lack of warnings is still relevant. *Hoppe* clearly holds that one of the relevant factors in the analysis of the totality of the circumstances is "whether the defendant was informed of the right to counsel and right against self-incrimination." *Hoppe,* 261 Wis. 2d 294, ¶ 39. The lack of these warnings, even when not required by the relevant case law, is a relevant piece of the equation. The circuit court stated in its oral decision, "[I]t is clear no *Miranda* warnings were given, which would make this an easier case by a lot." While relevant, the lack of

warnings is not dispositive, and in this case, it does not tip the scales to make Lemoine's statements involuntary.

¶ 34. For these reasons, we agree with the circuit court's determination that Lemoine's statements were voluntary and thus admissible. Considering all relevant factors, the tactics of the police in this case did not overcome Lemoine's will or his ability to resist. The State met its burden of showing voluntariness by a preponderance of the evidence.

## B. *Harrison/Anson* Analysis

¶ 35. We briefly address the analysis that would follow if we had found Lemoine's statements involuntary. The State and Lemoine agree that if the statements are found to be involuntary on appeal, after Lemoine testified at trial, then the next proper step is to conduct a *Harrison/Anson* analysis. We note that Lemoine moved for reconsideration at the court of appeals for failure to conduct a *Harrison/Anson* analysis, and the court of appeals denied it, stating, "we have already addressed and rejected Lemoine's Harrison argument by holding that the error was harmless. Nothing in the materials submitted causes us to reconsider our decision." *State v. Lemoine,* No. 2010AP2597, unpublished slip op. (Wis. Ct. App. Oct. 13, 2011).

¶ 36. In *Harrison v. United States,* 392 U.S. 219 (1968), the United States Supreme Court found that when statements later determined to be inadmissible are used at trial and the defendant takes the stand and testifies, there must be a determination of whether the

192

defendant's testimony at trial was impelled by the admission of the illegally obtained statements in violation of the Fifth Amendment. *Id.* at 224–25. In *State v. Anson,* 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776, this court held that the review required by *Harrison* is a paper review where the circuit court makes historical findings of fact based on the entire record. *Id.,* ¶ 13. The test laid out in *Anson* requires the State to prove beyond a reasonable doubt the following:

> First, the circuit court must consider whether the defendant testified "in order to overcome the impact of [statements] illegally obtained and hence improperly introduced [.]" *Harrison,* 392 U.S. at 223, 88 S.Ct. 2008. Second, even if the court concludes that the defendant would have taken the stand, it must determine whether the defendant would have repeated the damaging testimonial admissions "if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225–26, 88 S.Ct. 2008.

*Id.,* ¶ 14. Only after a *Harrison/Anson* analysis does the court proceed to a harmless error analysis. *See id.,* ¶¶ 15–16. In this case, we decide that Lemoine's statements are voluntary. Therefore, there is no need to proceed to a *Harrison/Anson* or a harmless error analysis.

## IV. CONCLUSION

¶ 37. We hold that the admission of Lemoine's statements at trial was not error because, under the totality of the circumstances, the statements were voluntary. The well-established test for voluntariness balances the personal characteristics of the defendant against pressures imposed by law enforcement officers to determine if the pressures exceeded the defendant's ability to resist. *Clappes,* 136 Wis. 2d at 236. Nothing

about Lemoine made him particularly vulnerable; he was 22 years old, had earned a high school equivalency diploma (HSED), held a job as a truck driver, was familiar with one of the interviewing officers, and was assertive enough to voice his discomfort with a female officer's presence, a concern the police accommodated. The interrogator overstated the evidence against Lemoine and provided Lemoine with incentives to give information, including a promise that Lemoine would not be jailed for the night if he told the "true story." When balanced, however, against the characteristics of Lemoine, the tactics used by the police in the 75 to 80 minute interrogation did not rise to the level of being coercive. Therefore, it was not error for the circuit court to admit the voluntary statements at trial. Accordingly, though our analysis differs from that of the court of appeals, we affirm its decision.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 38. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). This case calls upon the court to address two issues: (1) whether the defendant's confession was voluntary; and (2) whether the court of appeals erred by not conducting a *Harrison/Anson* analysis. I write separately to address both issues.

I

¶ 39. The majority has correctly stated the legal principles governing the determination of the voluntariness of confessions. Voluntariness is evaluated on a case-by-case basis by analyzing the totality of the circumstances. Both the circuit court and court of appeals concluded that this case presents a close call on the issue of voluntariness. I agree it is close but, in my opinion, this defendant's confession was involuntary.

¶ 40. I watched the video of the interrogation. This is a close case because the video is, on its surface, reassuring that the interrogation was conducted in a polite, solicitous and non-threatening manner. Yet, the interrogation techniques using deception and promises came right out of the guidebooks on how to interrogate a suspect to induce a confession. The interrogation techniques used here have not been condemned out of hand by the United States Supreme Court, but they have to be carefully examined in each case. Tipping the scale for me here is that in addition to the deceptive interrogation techniques and the defendant's personal vulnerabilities, the law enforcement officers misinformed the defendant of his constitutional right to call an attorney. In considering the totality of circumstances, the misinformation about the defendant's constitutional rights pushes this case over the line for me.[1]

¶ 41. I recognize that "no confession following interrogation is completely voluntary in the psychological sense of the word."[2] In determining voluntariness, a

---

[1] No one claims that the law enforcement officers were required to give the defendant *Miranda* warnings. The court has, however, emphasized the importance of the *Miranda* warnings and the constitutional rights the *Miranda* decision protects.

I conclude that law enforcement officers who do not have to give the *Miranda* warnings err in giving a suspect misinformation about his or her constitutional rights regarding counsel. *See State v. Knapp,* 2003 WI 121, ¶¶ 46, 73, 265 Wis. 2d 278, 666 N.W.2d 881 (an officer's intentional omission of *Miranda* warnings to get information from a suspect entitled the suspect to have physical evidence against him suppressed at trial when he gave incriminating statements before being advised of his *Miranda* rights).

[2] Fred E. Inbau et al., *Criminal Interrogation and Confessions* 417 (4th ed. 2004).

court applies legal principles, not psychological or philosophical principles.

¶ 42. Under the law, a confession is not voluntary when the pressures imposed by law enforcement exceed the suspect's ability to resist.[3]

¶ 43. Confessions are the product of the situational pressures inherent in the conditions of interrogation, including excessively long questioning, the presentation of false incriminating evidence, and the use of themes that imply leniency.[4] The interrogation techniques aim to break down the suspect's will until he provides the police with the information they are looking for.

¶ 44. Confessions are also the product of the personal vulnerabilities of the suspect. The court must therefore consider such factors as the suspect's age; education; intelligence; physical, mental and emotional condition; personality traits; and previous experience with law enforcement.[5]

¶ 45. The single-minded purpose of interrogating the defendant in the present case was to elicit an incriminating statement and perhaps a full confession to assist the district attorney in securing a conviction. The Sauk County Sheriff's Department was not investigating a crime for which it did not have a suspect or a viable lead. Detective McClure had received a report from the victim's mother and a statement from the

---

[3] *See* majority op., ¶ 3; *Knapp,* 265 Wis. 2d 278, ¶ 89 (citing *State v. Clappes,* 136 Wis. 2d 222, 235–36, 401 N.W.2d 759 (1987)).

[4] Jennifer T. Perillo & Saul M. Kassin, *Inside Interrogation: The Lie, The Bluff, and False Confessions,* 35 Law & Hum. Behav. 327 (2011).

[5] *State v. Clappes,* 136 Wis. 2d 222, 235–37, 401 N.W.2d 759 (1987); *see also* Inbau et al., *supra* note 2, at 417.

victim that the defendant had committed a sexual assault. The only thing left to do was to get a confession from the defendant.

¶ 46. The interrogation was conducted in a subtle, quiet, and non-threatening way. During the entire interrogation, law enforcement officers were polite and solicitous of the defendant. They posed as the defendant's friends, there to help the defendant. The techniques used were right out of the books on how to interrogate a suspect to induce a confession. They were interrogation techniques recommended to break down a suspect's natural inclination to deny wrongdoing.

¶ 47. The defendant here was interviewed in a small, windowless room, with no distractions, designed to induce stress and structured to promote a sense of isolation and create a sense of anxiety, despair, and a desire to escape.[6]

¶ 48. For the first half of the interrogation, which went on for nearly an hour and a half, the defendant denied inappropriately touching the victim. Only after the Lieutenant offered deceptive misinformation about evidence against the defendant, made promises to the defendant, and misinformed the defendant of his constitutional right to counsel, did the defendant confess to the crime.

¶ 49. The Lieutenant used the false evidence ploy, by which interrogators bolster an accusation by presenting the suspect with supposedly incontrovertible evidence of his guilt.[7]

---

[6] Inbau et al., *supra* note 2, ch. 5; Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations,* 34 Law & Hum. Behav. 3, 6–7 (2010).

[7] Perillo & Kassin, *supra* note 4.

¶ 50. The Lieutenant made multiple assertions regarding the victim's physical exam; no assertions were based in fact. The Lieutenant told the defendant that the victim went through "very lengthy medical procedures" and that they had some "pretty solid evidence." The Lieutenant asked the defendant for a DNA swab, implying there was some sort of DNA evidence. When that did not work, the Lieutenant stated that the victim was getting "specialized testing," and that they had enough with the "tests and testimonies" for probable cause and he and the district attorney were confident the allegations were true.

¶ 51. In reality, the physical exam performed on the victim found no evidence of a sexual assault.

¶ 52. The Lieutenant told the defendant that the only way he could be helped was to "come clean." The Lieutenant explained that the harder police have to work, the less sympathy they would have for the defendant. The Lieutenant told the defendant that he did not believe his story and that, if the defendant would "come clean," the officers could help him out "by not making a big production in the [newspaper]." Majority op., ¶ 8.

¶ 53. Making threats or promises during an interrogation that address the consequences about which the suspect is concerned is very influential in breaking a suspect's will and straddles the line of permissibility.[8]

¶ 54. The defendant was very concerned about losing his job; about spending a night in jail; about ending up in court; and about having his conduct publicized in the community.

¶ 55. The Lieutenant played to all of the defendant's concerns.

---

[8] Inbau et al., *supra* note 2, at 418.

¶ 56. The Lieutenant assured the defendant that if he admitted to the allegations, which were a felony, the felony conviction would not prevent him from keeping his job driving a truck. Majority op., ¶ 8.

¶ 57. The Lieutenant described three scenarios to the defendant: "We can arrest you and put you in jail, and you will go to court tomorrow. We can give you a citation and send you down the road. Or we can do nothing and wait until we get everything." The defendant requested the citation. The Lieutenant replied: "No, I'm not going to give you the choice." Majority op., ¶ 9.

¶ 58. The Lieutenant told the defendant: "If we get the true story on you today, I'll see to it that you don't spend the night in jail, okay?" The defendant's response to the Lieutenant was: "Just don't take me to jail, and I'll admit to it."

¶ 59. The Lieutenant kept his promise to keep the defendant out of jail for the night. He also encouraged the defendant to talk with the district attorney so that "it doesn't end up in court" or "in the public forum." Majority op., ¶ 10.

¶ 60. The Lieutenant advised the defendant that if he confessed, he would be able to consult with an attorney as follows:

> And it will give you time to call an attorney and get your ducks in a row; all right? Otherwise, you know, we can lock you up, if we choose to do so. Which kind of limits your ability of what you can get.

¶ 61. When the defendant asked what he meant, the Lieutenant replied: "Well, you're not going to be able to make any phone calls or anything."

¶ 62. The Lieutenant was not fully truthful in advising the defendant about his inability to call or

199

speak to an attorney unless the defendant confessed. Indeed the Lieutenant's advice contravened the *Miranda* warnings: an accused has the right to remain silent and the right to have a lawyer present.

¶ 63. The defendant was 22 years of age with limited experience with law enforcement. He was at an age susceptible to police coercion.[9] The defendant appeared very naïve in the video and not at all aware of or suspicious of the law enforcement officer's motives or tactics.

¶ 64. The court summarized the factors a court should consider in determining whether a confession was voluntary in *State v. Clappes,* 136 Wis. 2d 222, 235–37, 401 N.W.2d 759 (1987), as follows:

> In determining whether a confession was voluntarily made, the essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police. The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative on the issue of whether the inculpatory

---

[9] There is no claim in the present case that the defendant made a false confession. Still, false confessions can occur in both voluntary and involuntary confessions.

Nearly one quarter of those exonerated through DNA in the United States were wrongfully convicted after giving what turned out to be a false confession. *See* Perillo & Kassin, *supra* note 4.

Young suspects are more likely to give a false confession. In a recent study analyzing 125 false confessions in the United States between 1971 and 2002, the largest sample ever studied, 63% of false confessions were made by suspects under the age of 25. Thirty-two percent of the suspects were under 18, meaning that 31% of the total persons falsely confessing were between 18 and 25. *See* Kassin et al., *supra* note 6, at 5.

statement was the product of a "free and unconstrained will, reflecting deliberateness of choice."

In examining whether a confession was rationally and deliberately made, it is important to determine that the defendant was not the "victim of a conspicuously unequal confrontation in which the pressures brought to bear on him by representatives of the state exceed[ed] the defendant's ability to resist." This determination is made, in turn, by examining the totality of the facts and circumstances surrounding the confession. The ultimate determination of whether a confession is voluntary under the totality of the circumstances standard requires the court to balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the questioning.

The relevant personal characteristics of the confessor include his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police. These factors must be balanced against the police pressures and tactics which have been used to induce the admission, such as the length of the interrogation, any delay in arraignment, the general conditions under which the confessions took place, any excessive physical or psychological pressure brought to bear on the declarant, any inducements, threats, methods or strategies utilized by the police to compel a response, and *whether the individual was informed of his right to counsel and right against self-incrimination.* (Emphasis added; internal citations omitted.)

¶ 65. I have considered the factors set forth in *Clappes*. The combination of the defendant's personal characteristics, the deceptive tactics, and the misinformation about the defendant's constitutional right to an attorney crosses the line between a voluntary and an involuntary confession for me. In my opinion, the

201

pressures exceeded the defendant's ability to resist. It's a close case, but in my opinion, this defendant's confession was involuntary.

## II

¶ 66. I also write separately here to call attention to the second issue raised by the parties. This second issue is, in my opinion, the reason the court granted the petition for review of the case, namely the *Harrison*[10]/*Anson*[11] analysis. The court of appeals failed to discuss these cases. It assumed the confession was involuntary and went directly to a discussion of harmless error. When the defendant moved the court of appeals to reconsider its decision for failure to conduct a *Harrison/Anson* analysis, the court of appeals denied the motion. The court of appeals responded:

> [W]e have already addressed and rejected Lemoine's *Harrison* argument by holding that any error was harmless.

¶ 67. The parties dispute various issues arising in a *Harrison/Anson* analysis, including:

- Does an appellate court have the authority to make a *Harrison* determination?

- How does a *Harrison/Anson* analysis comport with a harmless error analysis?

- May a reviewing court avoid determining whether the defendant's testimony was impelled by the admission of his police statement at trial and just determine whether the error was harmless?

[10] *Harrison v. United States*, 392 U.S. 219 (1968).

[11] *State v. Anson*, 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776.

202

- After a reviewing court has determined that the defendant's statements were not made voluntarily, may the court rely on the defendant's trial testimony to determine that any error admitting the confession was harmless?

- Is a *Harrison* determination based on a paper review of the record or is an evidentiary hearing in the circuit court required or allowed?

- If a *Harrison* determination is made by the circuit court, does the circuit court make findings about the credibility or plausibility of a witness's testimony at trial?

- If a *Harrison* determination is made by the circuit court, does the circuit court have to address the importance of the erroneously admitted evidence, along with the properly admitted evidence?

- Has the State carried its burden of proving beyond a reasonable doubt that the defendant's testimony at trial in the present case was not impelled by the admission at trial of his statement to police?

- If the defendant's testimony was impelled, is the error prejudicial per se?[12]

---

[12] *Compare Harrison,* 392 U.S. at 226 ("It has not been demonstrated, therefore, that the petitioner's testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' Accordingly, the judgment must be reversed.") (internal citation omitted); and *Anson,* 282 Wis. 2d 629, ¶ 56 ("We hold that the State has not demonstrated that 'the petitioner's testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' As such, we hold that Anson's testimony was impelled by the State's underlying constitutional violation. Thus, we hold that the circuit court's error in failing to suppress Anson's tape-recorded statement, which violated his Sixth Amendment rights, was not harmless. Therefore, we affirm the decision of the court of appeals and remand for a new trial.") (internal citations omitted).

¶ 68. Because the majority concludes that the confession was voluntary, it decides that it need not and does not address any *Harrison/Anson* issues.[13] Nevertheless, this court has often decided an important issue that is not determinative but is fully briefed and argued and is likely to arise again in other cases.[14] Unfortunately, these *Harrison/Anson* issues await another case.

¶ 69. For the reasons set forth, I write separately in dissent.

The United States Supreme Court has directed a reviewing court to use extreme caution before determining that admission of an involuntary confession was harmless. *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991).

[13] For a discussion of *Harrison,* see 3 Wayne R. LaFave et al., *Criminal Procedure* §§ 9.5(d), 10.2(c) (3d ed. 2007).

[14] *See, e.g., Les Moise, Inc. v. Rossignol Ski Co., Inc.,* 122 Wis. 2d 51, 54 361 N.W.2d 653 (1985) (We chose to decide the issues presented for review because the issue was likely to recur and we disagreed with the decision of the court of appeals, even though our opinion would not affect the parties directly.); *State ex rel. La Crosse Tribune v. Circuit Court,* 115 Wis. 2d 220, 229–230, 340 N.W.2d 460 (1983):

> [T]his court has held that it will retain a matter for determination although that determination can have no practical effect on the immediate parties: Where the issues are of great public importance; . . . where the precise situation under consideration arises so frequently that a definitive decision is essential to guide the trial courts; where the issue is likely to arise again and should be resolved by the court to avoid uncertainty . . . .

> This court has a law-declaring function, that is, determining on common-law principles what the law should be in view of the statutory and decisional law of the state and in view of the general trend of the law. . . . It is not inappropriate for this court, where a problem is likely to recur, to declare the law for the guidance of other courts, even though the particular controversy is moot (internal citations omitted).