COURT OF APPEALS
DECISION
DATED AND FILED

July 26, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2021AP40-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF1937

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

GERALD L. WILLIAMS,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Gerald L. Williams appeals a judgment of conviction entered following his guilty plea to one count of second-degree sexual assault of a child. On appeal, Williams renews his argument that the statements he made during police questioning were not voluntary and any of the statements that he made during the questioning must be suppressed. We disagree, and we conclude that Williams' statements were voluntary and were not the result of police coercion. Therefore, we affirm.

## BACKGROUND

¶2     On May 5, 2016, Williams was charged with first-degree sexual assault of a child after his girlfriend's eight-year old daughter, Diane,[1] accused Williams of touching her and forcing her to participate in oral and anal sex.

¶3     Prior to the charges being filed, two detectives, Detective Tim Behning and Detective Louise Bray, conducted an interview to question Williams about Diane's allegations. The interview took place at approximately 2:20 p.m. on May 4, 2016. The interview room contained a table and three chairs. Williams sat at the far end of the room, furthest from the door, and the detectives sat in the chairs between Williams and the door. Williams was not handcuffed, but he did have shackles on his ankles. At the beginning of the interview, though, he declined an offer to remove the shackles.

¶4     The interview began with Detective Behning reading Williams his *Miranda*[2] rights and asking Williams about his background, such as where he was

---

[1] For ease of reference and to protect the victim's identity, we use refer to the victim in this matter using a pseudonym.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

currently living.  During this line of questioning, Williams told the detectives that he drank alcohol and smoked marijuana a couple of days before the interview.  He also explained that he takes Xanax for irritability, a sleeping pill, and has taken Geodon for bipolar schizophrenia.  He further explained that he has ADHD.  Williams admitted that he last took Xanax a day and a half ago and he should get back on his medications.  However, Williams said that he was "okay to talk," despite not having had his medications.

¶5      After gathering background information, the detectives then moved to questions about the allegations.  At the outset, Williams repeatedly denied that he ever touched or harmed Diane and claimed that either Diane's cousin assaulted her or that Williams' sister put Diane up to making these allegations.  However, after further questioning, Williams began stating that if he did touch Diane, he did not remember.  Towards the end of the interview, Williams began stating that he remembered touching Diane's vagina on an occasion when Diane complained of pain in that area.  According to Williams, Diane put his hand on her vagina to show him where it hurt.  Williams also admitted to rubbing his penis on Diane's buttocks on another occasion, and he described that he was in the bedroom, Diane laid down next to him on the bed, and he rubbed himself on her.  Throughout the interview, though, he denied that he ever engaged in oral or anal sex, as Diane had alleged.

¶6      Over the course of the interview, Williams made several requests to go to a mental health facility, and the detectives denied each request.  When Detective Behning asked why Williams was asking to go to a mental health facility, Williams explained that it would help him to get back on his medications.  At another point during the interview, Detective Behning also explained that they would not take Williams anywhere for treatment, absent an emergency.

¶7     On other occasions throughout the interview, Williams attempted to exchange information about other criminal activity for consideration in his case. He offered, for instance, that he could be released and wear a wire. The detectives, however, continually told Williams that they could not make him any promises, and at one point in the interview, Detective Behning stated that they could not accept Williams' offer until Williams told on himself first.

¶8     As specific interview tactics relevant here, the detectives told Williams that they had used a device called a "spectroscope"[3] on Diane during her forensic interview. The detectives further asserted that the spectroscope showed that Diane was telling the truth. Throughout the interview, Detective Behning also suggested that Williams committed the assaults because Williams was not taking his medications, and Detective Behning encouraged Williams to cooperate or face years in prison.

¶9     Williams initially pled guilty to an amended charge of first-degree sexual assault of a child.[4] However, on May 10, 2018, after he had withdrawn his plea, Williams moved to suppress the statements that he made during the interview. In his motion, Williams argued that he did not knowingly and intelligently waive his *Miranda* rights.[5] He also argued that his statements were not voluntary as a result of both his mental state at the time of the interview and the tactics employed by the detectives during the interview, particularly those

---

[3] This was a fabrication because no such device exists.

[4] Williams was originally charged with first-degree sexual assault of a child, sexual intercourse with a child under twelve years of age. Williams pled guilty to an amended charge of first-degree sexual assault of a child, sexual contact with a child under sixteen years of age.

[5] This argument has not been pursued on appeal.

wherein the detectives fabricated scientific evidence. The circuit court held an evidentiary hearing on Williams' motion at which Williams and Detective Bray testified. The circuit court also viewed the recording of the interview.

¶10 Detective Bray testified that at no point did Williams indicate that he did not understand his *Miranda* rights or indicate that he did not want to speak with the detectives. In fact, Detective Bray testified that Williams was willing to provide a statement.

¶11 Detective Bray further testified that she has been involved in transporting individuals to a mental health facility for both emergency detentions and voluntary treatment. She described that, in order to initiate an emergency detention, she looked for the individual to demonstrate that he or she is a threat to self or others. She further testified that emergency detentions last about seventy-two hours.

¶12 Detective Bray stated that Williams indicated that he took Xanax, but he did not indicate he was being affected in any way by not having taken that medication. She indicated that Williams told them at the time of the interview that he became irritated when he did not take his Xanax in particular but that his lack of medication did not affect his understanding of the questioning that was taking place. She also testified that at no point did she see any indication that Williams did not understand the questioning or any sign that Williams was suffering from a mental health crisis. In fact, she also testified that Williams' requests to go to a mental health facility for treatment did not change her assessment of the situation because Williams did not meet the criteria for an individual in need of emergency mental health treatment.

¶13     Detective Bray further indicated that Williams attempted to negotiate an exchange of information during the interview, wherein he would provide information on other criminal activity for consideration on his case. She described Williams' offer as uncommon:

> Q       Is it common for suspects to indicate they want to provide information to law enforcement officers during these types of interviews?
>
> A       In my experience, it's not common.
>
> Q       Do individuals who do that tend to have more experience with the justice system would you qualify it as?
>
> A       Yes.

¶14     Detective Bray continued that she had no discussion with Detective Behning prior to questioning Williams about any sort of methods or techniques that they would use to question Williams. She testified that they told Williams during the interview that they used a "spectroscope" on Diane during Diane's forensic interview, and that they further told Williams that the spectroscope showed that Diane was not lying about the assaults. Detective Bray also acknowledged that the spectroscope was a fabricated device they told Williams about to encourage Williams to confess. Despite introducing the spectroscope into the interview, she testified that Williams did not provide any sort of incriminating statements until nearly the end of the interview. She testified that even then, Williams continued to deny certain specifics of the assault.

¶15     Williams then testified that he was not taking his medications at the time of the interview, and he repeatedly requested to be taken to a mental health facility so that he might be able to take his medications. Williams described that when he does not take his medications he does not feel like himself and he becomes irritated and shuts down. Specifically, Williams testified, "[I]f you keep

pestering me or keep saying the same thing over and over and over and over again, I be irritated and then I just say stuff." He continued, "Like when the [d]etective kept asking me questions over and over and over again, … I just shutdown and then I just agree with him." Williams testified that he "gave up" and "just started saying yes" so that the questioning would end and he could leave. He described that he felt that the detectives were putting pressure on him "to say what they wanted [him] to say" when the detectives told him about the spectroscope and denied his requests to go to the mental health facility.

¶16    On cross-examination, Williams admitted that he told the detectives that he felt okay talking to them without his medications that day. He further admitted that he had not been taking his medications by his own choice for some time. He additionally acknowledged that he never fully admitted to what the detectives said he did—namely, force Diane to participate in oral and anal sex.

¶17    The circuit court found, in spite of Detective Bray's demonstrated willingness to lie about the spectroscope during the interview, that Detective Bray's testimony was "largely credible and worthy of belief." As to Williams, the circuit court also found his testimony "credible in some respects" but recognized that Williams' testimony "competes with some of the information that is contained in the video recording." In particular, the circuit court found that Williams' testimony was discredited because there were "an array of opportunities" for Williams to become irritated during the interview, but there is no indication in the video that Williams ever became irritated.

¶18    Instead, the circuit court described Williams' overall demeanor exhibited in the video as "pleasant" and "thoughtful." The circuit court described Williams as "entirely calm" and "responsive to questions." In fact, the circuit

court observed that Williams was "prompt" in his responses and "[t]here's logic behind the defendant's response." The circuit court further described:

> There is no physical manifestation of any discomfort. There is no physical manifestation of any preoccupations. There's no obvious distraction. There's no evidence of responding to internal stimulus that's not going on around him, some hallucination or even some minor thought preoccupation. There's nothing about the defendant's manner at this point in the interview or frankly throughout the interview that conveys … that all is not well. There's just nothing about his manner and it's small things.

The circuit court then continued by observing that there is nothing in the recording indicating that Williams had any nervous energy, such as fidgeting, bouncing his leg, or any needless hand movements. Indeed, the circuit court observed that, when Williams asked to be taken to a mental health facility for treatment, Detective Behning asked why Williams wanted to go because Williams looked to be doing okay, and instead of explaining why Williams was having a mental health crisis, Williams only responded that the facility would help him to take his medications.

¶19 The circuit court also found that Williams' testimony conflicted with the video in another respect. Williams testified at the hearing that he made incriminating statements because he was just trying to go along with what the detectives were saying he did. However, the circuit court observed that Williams seemed able to resist the detectives' attempts to tease the details of any assault out of Williams. The circuit court also found Williams' statements during the interview to be appropriately "self-serving" and to demonstrate prior experience with law enforcement. In particular, the circuit court observed that Williams was sophisticated enough to know to trade information of other criminal activity for

consideration in this case and to understand that a temporary hold at a mental health facility is seventy-two hours.

¶20   The circuit court ultimately denied Williams' motion, and Williams entered a guilty plea to the amended charge of second-degree sexual assault of a child. Williams now appeals.

## DISCUSSION

¶21   On appeal, Williams argues that his statements made during the interview should have been suppressed because they were not voluntary. Specifically, he argues that his statements were not voluntary because the detectives denied his requests for mental health treatment and the detectives lied that a spectroscope—a nonexistent device—was used on Diane and determined that Diane's allegations were truthful. We disagree, and we conclude that Williams' statements were voluntary due to the lack of coercion used by the detectives during the interview.

¶22   Our standard of review for determining the voluntariness of Williams' statements requires us to examine the application of constitutional principles to historical facts. *State v. Jerrell C.J.*, 2005 WI 105, ¶16, 283 Wis. 2d 145, 699 N.W.2d 110. We accept the trial court's findings of fact unless they are clearly erroneous. *State v. Vice*, 2021 WI 63, ¶21, 397 Wis. 2d 682, 961 N.W.2d 1. However, the application of the law to those facts is a question of law that we review independently. *Id.*

¶23   "The Fourteenth Amendment of the Constitution and Article I, Section 8 of the Wisconsin Constitution require a statement to be voluntary in order to be admitted into evidence." *Id.*, ¶28.

> A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.

*State v. Hoppe*, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407. In assessing whether a statement was voluntary, we look to the totality of the circumstances and balance "the suspect's personal characteristics … against any pressures imposed upon him by police." *Vice*, 397 Wis. 2d 682, ¶30. The State bears the burden of proving that a defendant's statement was voluntary by a preponderance of the evidence. *State v. Lemoine*, 2013 WI 5, ¶14, 345 Wis. 2d 171, 827 N.W.2d 589.

¶24 However, "[b]efore we balance personal characteristics against police pressures, we must first examine the threshold matter of coercion." *Vice*, 397 Wis. 2d 682, ¶31. "Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *Hoppe*, 261 Wis. 2d 294, ¶37. If there is no police coercion or improper police pressure, "there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures." *Vice*, 397 Wis. 2d 682, ¶31. Thus, "[t]he pertinent inquiry is whether the statements were coerced or the product of improper pressures exercised by the person or persons conducting the interrogation." *Hoppe*, 261 Wis. 2d 294, ¶37. Establishing coercion is "a high bar for a defendant to surmount." *Vice*, 397 Wis. 2d 682, ¶32.

¶25 Accordingly, we turn first to the threshold question of whether Williams' statements were the product of coercion or improper police pressure. In arguing that the detectives used coercive techniques during his interview, Williams points specifically to their denials of his repeated requests for mental

health treatment, to the detectives lying about the use of a nonexistent device, the spectroscope, on Diane, and to certain more general techniques used during the interview, such as the use of "minimization" and "maximization." We address each of his arguments in turn, and we conclude that none of these techniques amount to coercion or improper police pressure.

### A. Denials of Williams' Requests for Mental Health Treatment

¶26 We begin with Williams' argument that the detectives' denials of his requests for mental health treatment was coercive. We observe that Williams made repeated requests throughout the interview to go to a mental health facility, and that during the interview and at the hearing, Williams stated that he becomes irritated without his medication and the mental health facility helps him with taking his medications. In conjunction with certain requests made during the interview, Williams even offers to tell the detectives "everything from detail to detail," guarantees that he will become a "cooperating witness," and tell "everything from the beginning to the end" if only the detectives would first send him to a mental health facility for three days where he can take his medications. Despite these several requests, however, the detectives' denials were not coercive because Williams provided no reason for the detectives to believe that his requests were genuine and he was truly in need of treatment.

¶27 Williams asserted that he becomes irritated without his medications and was in need of his medications, yet the circuit court found after watching the recording of the interview that there was no reason to believe that Williams was irritated, much less suffering from a mental health crisis at the time of the interview based on how Williams conducted himself. The circuit court found that Williams appeared calm, pleasant, and thoughtful, despite several opportunities

11

presented during the interview where Williams could become upset, and Williams provided no signs of nervous energy, discomfort, or distractions.

¶28    Additionally, as Detective Bray testified, the detectives were trained to look for certain signs for initiating an emergency detention, and Williams did not meet any of the criteria of someone suffering from a mental health crisis and in need of an emergency detention.  Furthermore, Detective Behning stated during the interview that Williams appeared to be okay and asked Williams to explain why he needed treatment.  Williams explained only that being sent to the facility would help him get back on his medications, and Williams provided no explanation to the detectives as to why he was in immediate need of treatment.  In fact, at the beginning of the interview, Williams originally indicated that he was okay to talk to the detectives even though he had not taken his medications.  Thus, without a reason to believe that Williams was genuinely suffering from a mental health crisis at that time, the detectives' denials of Williams' requests to be sent to a mental health facility were not coercive or improper police pressure.  *See Vice*, 397 Wis. 2d 682, ¶46 ("[T]he officers were not required to believe [the defendant's] claims that he did not remember, and it was not coercive for them to question those claims during the interview.").

¶29    Williams argues that his mental state at the time of the interview made him particularly susceptible to even mild pressures imposed on him by the detectives.  He cites *Hoppe* for support, and he maintains that his mental state at the time of questioning makes him similarly situated and that his mental state at the time of questioning made him vulnerable, similar to the defendant in *Hoppe*.  He further argues that because of his vulnerability, we must consider his mental state in analyzing whether the tactics employed here were coercive.  We wholeheartedly disagree.

12

¶30    *Hoppe* involved a defendant who was questioned in a hospital room while he was experiencing, among other things, memory loss, hallucinations, tremors, vomiting, lethargy, dehydration, slurred speech, and difficulty tracking the questions posed to him by police.  *Id.*, 261 Wis. 2d 294, ¶¶48-49.  Williams' situation is clearly distinguishable—Williams, who was twenty-eight years old at the time of the interview, had completed school through the tenth grade, and revealed that he had prior experience with police, exhibited no such signs of a medical emergency.  Indeed, wholly unlike the defendant in *Hoppe*, Williams demonstrated appropriately self-serving and logical responses to questioning, an ability to negotiate on his behalf, and an entirely calm, pleasant, and thoughtful demeanor throughout the entire interview.  Williams' susceptibility to police pressures, therefore, is far from comparable to the vulnerability of the defendant presented in *Hoppe*.

¶31    Moreover, *Vice* explicitly requires the analysis of coercion prior to any consideration of a defendant's personal characteristics, *see id.*, 397 Wis. 2d 682, ¶31, and Williams' argument that *Hoppe* requires us to account for his mental state in the coercion analysis after *Vice* is undeveloped and conclusory.  Therefore, we reject Williams' reliance on *Hoppe* for the proposition that he was particularly susceptible to even mild police pressures at the time of the interview, and we reject Williams' argument that we must account for his mental health in determining whether the police conduct here was coercive.  *See Lemoine*, 345 Wis. 2d 171, ¶23 (rejecting the proposition that the defendant was vulnerable when he was an adult, held a job, had an education, and "remained actively engaged throughout the interview"); *see also State v. Clappes*, 136 Wis. 2d 222, 238-39, 401 N.W.2d 759 (1987).

### B. The Spectroscope

¶32    Williams further argues that the detectives lied about using a spectroscope on Diane during Diane's forensic interview, and the detectives lied that the spectroscope showed that Diane was telling the truth about the assaults. We are not persuaded that the detectives' deceit in this regard amounts to coercion or improper police pressure.

¶33    "The interrogation of a suspect typically requires some deception; a common form of deception is to exaggerate the strength of the evidence against the suspect." *State v. Triggs*, 2003 WI App 91, ¶15, 264 Wis. 2d 861, 663 N.W.2d 396. In fact, even when police engage in "outright deceit" and "active deception," a suspect's statement may still be voluntary. *Vice*, 397 Wis. 2d 682, ¶¶33, 45. "Of the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Triggs*, 264 Wis. 2d 861, ¶19 (citation omitted).

¶34    In this case, we are asked to address the deception related to the detectives' representation that a nonexistent device—the spectroscope—was used to assess the truthfulness of Diane's allegations of assault. As the circuit court observed, "[t]his is really just the police inflating the quality of their evidence as they talk to the defendant." "[E]xaggerations of evidence against a defendant are the least coercive police deceptions because they can be countered with the knowledge of the person being questioned." *Lemoine*, 345 Wis. 2d 171, ¶32. The spectroscope, while presented by the detectives as a real device capable of assessing Diane's veracity, could still be countered with Williams' own knowledge. Thus, Williams had the ability to assess the lie about the spectroscope and check any misrepresentation made by the detectives with his own memory of

the alleged assaults. We, thus, conclude that the misrepresentation made by the detectives was not coercive.

¶35 Williams contends that the argument that he was nevertheless able to assess the lie about the spectroscope understates the effect that the spectroscope had on the interview because he was presented with a scenario in which he would be proven guilty by the spectroscope, even if he knew otherwise. We are not persuaded.

¶36 When the detectives first introduced the spectroscope into the interview, Williams continued to deny the allegations, and it was not until nearly thirty minutes later that Williams began making the incriminating statements he now argues should be suppressed as involuntary statements. However, Williams' continued denials after the introduction of the spectroscope into the interview indicate that the detectives' use of the spectroscope was not coercive.

¶37 In fact, Williams did not begin disclosing any details of an assault until the detectives suggested that Williams may have "done it" as a result of not being on his medications, and at that time, Williams nonetheless indicated that if he did it, he did not remember. Furthermore, it was still not until even later in the interview that Williams began providing statements that he remembered touching Diane's vagina after she complained of pain in that area, and it was still later in the interview that he stated that he remembered rubbing his penis on Diane's buttocks. Thus, the timing of Williams' statements shows that the detectives "used other tactics far more frequently and effectively during the interview, and it was those tactics that led most directly to [Williams] making statements against self-interest." *See Vice*, 397 Wis. 2d 682, ¶43. The spectroscope "constituted only one component of the dialogue" and the context and nature of the use of the

spectroscope leads us to reject Williams' argument that the spectroscope was coercive. *See id.*, ¶¶42-43. In short, there is nothing about the totality of the circumstances surrounding the statements about the spectroscope that would lead us to conclude that the detectives engaged in coercion or improper police pressures.

### C. General Interrogation Techniques

¶38 While Williams focuses on the denials of his requests for mental health treatment and the lie about the spectroscope, Williams also highlights other techniques employed during the interview, such as minimization and maximization, and he argues that these techniques were coercive in his situation. We conclude that nothing about these other techniques, or the interview generally, indicates that any coercion or improper police pressure was used during the interview.

¶39 During the interview, Detective Behning employed a technique to "minimize" Williams' behavior by suggesting that Williams' behavior was the result of Williams not taking his medications, and Detective Behning also tried at other points to "maximize" Williams' behavior by indicating that Williams would face years in prison if Williams did not cooperate during the interview. Considering the use of these techniques in the totality of the circumstances, we conclude that they were not coercive. "Police may, and often do, engage in multiple tactics and strategies in the same interview without rendering coercive what would be permissible in isolation." *Vice*, 397 Wis. 2d 682, ¶48. Thus, the fact that the detectives here engaged in multiple techniques, including minimization and maximization, does not render their conduct coercive.

¶40 More importantly, however, the interview

> employed none of the police tactics and stratagems which would be inherently coercive, such as questioning a defendant for excessively long periods of time without breaks for food or rest, threatening a defendant, with physical violence or otherwise, or making him promises in exchange for his cooperation, or engaging relays of interrogators to question a defendant "relentlessly" or conducting questioning so as to "control and coerce the mind of the defendant."

*Clappes*, 136 Wis. 2d at 239 (citations omitted); *see also Vice*, 397 Wis. 2d 682, ¶¶49-50.

¶41 At the outset of the interview, Williams was read his *Miranda* rights, and he indicated that he understood those rights. He further indicated to the detectives that he was okay to talk to them that day. The interview also took place in the afternoon and lasted less than two hours. Williams was not handcuffed, and although he was shackled at his ankles, he declined an offer to have the shackles removed. He had not been denied food or rest while he was in custody prior to the interview. The detectives employed no physical force and no threats. The detectives also complied with other requests Williams made during the interview, such as each request Williams made for a cigarette and Williams' request to have Detective Bray—a female detective—leave the room in order that Williams could feel more comfortable discussing the allegations.

¶42 In short, there is nothing about the totality of the circumstances surrounding the interview that would lead us to conclude that the detectives engaged in coercion or improper police pressures.

## CONCLUSION

¶43 In sum, we conclude that Williams' statements were voluntary and were not the product of police coercion or improper police pressures.

Accordingly, we affirm the circuit court's denial of Williams' motion and affirm the judgment.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).