COURT OF APPEALS
DECISION
DATED AND FILED

March 20, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2023AP866-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2019CF74

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

DEVIN M. KIRKLAND,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Portage County: THOMAS B. EAGON, Judge. *Affirmed*.

Before Graham, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Devin Kirkland appeals her conviction for possession with intent to deliver methamphetamine, as a party to a crime.

Specifically, Kirkland challenges the circuit court's denial of her motion to suppress statements that she made to police on the basis that the statements were involuntary. We conclude that Kirkland's statements were voluntary and we therefore affirm.

## BACKGROUND

¶2 The following facts are derived from the evidence introduced at the hearing on Kirkland's motion to suppress and are not disputed.

¶3 Kirkland made incriminating statements during an interview with Lieutenant Lisa Rennie and Detective Aaron Yenter, both of whom testified at the suppression hearing. At the time of the interview, Rennie was a drug investigator with the Wausau Police Department. Rennie testified that she and Kirkland "had ongoing contact over the years": Kirkland, who Rennie described as "an active meth addict," would provide Rennie with information that Rennie used in her investigations, and Kirkland would reach out to Rennie when she was concerned about her safety.

¶4 Yenter, a drug detective with the City of Stevens Point Police Department, identified Kirkland as a potential witness while investigating a methamphetamine distributor in Stevens Point. Yenter knew that Rennie had contact with Kirkland and Yenter reached out to Rennie because he wanted to speak with Kirkland as part of his investigation. Yenter asked Rennie to coordinate a meeting between him and Kirkland. At around the same time, Kirkland reached out to Rennie because Kirkland had received a letter that she perceived to be threatening.

2

¶5    Rennie arranged for Kirkland to come to the Marathon County Sheriff's Department to discuss the letter, where, unbeknownst to Kirkland, Yenter would also be present. When Kirkland arrived, she was brought to an interview room where Rennie and Yenter joined her.[1] The interview was recorded and a transcript of the interview was admitted into evidence at the suppression hearing.[2] Both Rennie and Yenter were present for the entire interview.

¶6    At the interview, Rennie introduced Kirkland to Yenter but did not explain why Yenter was present. Rennie and Kirkland first discussed the letter that Kirkland had received. Kirkland believed that the letter contained threats that she was receiving because she had provided information to Rennie. Rennie went through the letter with Kirkland, addressing the specific parts of the letter that Kirkland identified as threatening and the reasons that Kirkland offered in support of her belief that the letter was threatening. Rennie assured Kirkland that there was no threat and told Kirkland that her concerns were the result of "meth paranoia."

¶7    The discussion transitioned to Kirkland's knowledge about specific individuals and their involvement in methamphetamine transactions. While answering Rennie and Yenter's questions, Kirkland made incriminating statements regarding her involvement in these transactions; specifically, she told Rennie and

---

[1] Rennie testified that she was not sure whether it was Rennie herself or Kirkland who requested to meet regarding the letter that Kirkland had received. The circuit court found that Rennie "was not sure who initially requested the meeting," but that "[i]t does sound that the most likely scenario was that Miss Kirkland had contacted Detective Rennie and wanted to meet with her."

[2] The transcript is not of the entire interview; rather, it begins partway through the interview.

Yenter about occasions on which she had "middled," or been "the middle person," in the transactions. Relevant here, during the course of the interview, Yenter stated that he knew that Kirkland was not telling them everything that she knew and he exhorted her to be honest. Kirkland asked, "So I am getting arrested?" Rennie responded, "No. I'm not -- I told you, I'm not arresting you, and I don't lie to you; right?" Similarly, Yenter responded, "No. We're -- you're not getting arrested, but you need to tell us the truth." When Yenter once again encouraged Kirkland to be honest, Kirkland asked, "So that way, it can be used against me?" Yenter responded, "Not necessarily…. It depends on if you're going to cooperate." Yenter stated, "[T]he more honest and open you are that we don't have to go into details of what we know makes your case a lot better." Rennie and Yenter did not provide Kirkland with *Miranda* warnings,[3] and at the end of the interview, Kirkland left. We discuss the relevant parts of the interview in greater detail, and quote the interview transcript at length, in the analysis that follows.

¶8 Approximately five months after the interview, the State charged Kirkland with possession with intent to deliver methamphetamine, as a party to a crime.[4] Kirkland moved to suppress the statements that she made during the interview, which Kirkland argued were involuntary and thus inadmissible.[5]

---

[3] *See **Miranda v. Arizona***, 384 U.S. 436 (1966).

[4] In addition to alleging that Kirkland had made incriminating statements during the interview with Rennie and Yenter, the complaint alleged that Facebook messages and text messages between Kirkland and the methamphetamine distributor whom Yenter had been investigating showed Kirkland's involvement in the relevant methamphetamine transactions.

[5] In the circuit court, Kirkland also argued that her statements from the interview should be suppressed because she had not been provided *Miranda* warnings.

¶9      The circuit court concluded at the suppression hearing that Kirkland's statements were voluntary and it denied Kirkland's motion.  The court found that "Kirkland came to the sheriff's department of her own accord," that Kirkland "was told on her arrival that she was not going to be arrested," that "there were no handcuffs placed on her," that "Kirkland was repeatedly told she was not under arrest, but that she should tell them the truth," and that Kirkland "was not fearful" during the interview.  The court additionally noted that it had "not heard any testimony that [Kirkland] was in any way restrained or not allowed to leave."

¶10      Kirkland pled no contest to the charge of possession with intent to deliver methamphetamine.  She now appeals.

## DISCUSSION

¶11      "The question of voluntariness involves the application of constitutional principles to historical facts.  We give deference to the circuit court's findings regarding the factual circumstances that surrounded the making of the statements.  However, the application of the constitutional principles to those facts is subject to independent appellate review."  *State v. Hoppe*, 2003 WI 43, ¶34, 261 Wis. 2d 294, 661 N.W.2d 407 (citations omitted).

¶12      The admission of a defendant's involuntary statements violates due process.  *Id.*, ¶36.  Statements are voluntary "if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist."  *Id.*  "It is the State's burden to prove by a preponderance of the evidence that the statements were voluntary."  *Id.*, ¶40.

¶13 "Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *Id.*, ¶37. "[E]stablishing coercion is a high bar for a defendant to surmount." *State v. Vice*, 2021 WI 63, ¶32, 397 Wis. 2d 682, 961 N.W.2d 1. That is because "the protections of the Due Process Clause are intended to safeguard against conduct or circumstances that 'destroyed [the suspect's] volition and compelled [the suspect] to confess.'" *Id.* (first alteration in original) (quoting *Colorado v. Connelly*, 479 U.S. 157, 162 (1986)). When identifying coercive police conduct, we are aided by case law analyzing various police tactics to determine whether they were coercive. *Id.*, ¶33.

¶14 To determine whether a defendant's statements were voluntary, the pressures imposed upon the defendant are balanced against the personal characteristics of the defendant using a totality of the circumstances standard. *Hoppe*, 261 Wis. 2d 294, ¶38. The relevant police pressures and tactics include:

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.*, ¶39 "The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." *Id.*

¶15 Kirkland argues that, in considering the totality of the circumstances and balancing the police conduct against Kirkland's personal characteristics, Kirkland's statements were involuntary. *See State v. Kruckenberg*, 2024 WI App 45, ¶40, 413 Wis. 2d 226, 11 N.W.3d 131 ("'The balancing of the defendant's

6

personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant.' Our supreme court recognizes that police pressures 'that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures.'" (quoted sources omitted)). The State counters that there was no coercive police conduct and that as a result we need not consider Kirkland's personal characteristics. *See Vice*, 397 Wis. 2d 682, ¶31 ("If our analysis of the facts does not reveal coercion or improper police pressures, there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures.").

¶16 For purposes of this opinion, we will assume that Kirkland is correct and that we must consider Kirkland's personal characteristics when analyzing the totality of the circumstances. Accordingly, we begin by considering the allegedly coercive police conduct, we then consider Kirkland's personal characteristics, and finally, we balance the police conduct against Kirkland's personal characteristics. Based on our analysis, we ultimately conclude that the State has met its burden in showing that Kirkland's statements were voluntary.

*I. Police conduct.*

¶17 Kirkland argues that the tactics that Rennie and Yenter used were coercive. Specifically, she argues that Rennie and Yenter employed a coercive "'false friend' approach," that Rennie and Yenter "told her that she was not under arrest and would not be arrested," and that Yenter gave Kirkland a "false assurance that Kirkland's statements would not be used against her if she cooperated." We address each contention in turn.

7

¶18 First, Kirkland argues that because she believed that she was meeting with Rennie, whom she trusted, to discuss her safety concerns arising from the letter that she had received, Rennie and Yenter obtained her incriminating statements using a coercive "'false friend' approach." Kirkland relies on *Spano v. New York*, 360 U.S. 315 (1959). *Spano*, however, is materially distinguishable.

¶19 In *Spano*, after the defendant was indicted for first-degree murder and a warrant issued for his arrest, he called a childhood friend who was a "fledgling police officer" and explained his version of events and that he intended to obtain counsel and turn himself in. *Id.* at 316-17. The defendant turned himself in and was then questioned by police for approximately eight hours, which "began in early evening" and lasted "until the not-too-early morning." *Id.* at 322. The defendant repeatedly requested to speak to his attorney, which police refused. *Id.* After more than five hours of questioning, police told the officer whom the defendant had called before turning himself in (the defendant's friend from childhood) to falsely "tell [the defendant] that [the defendant's] telephone call had gotten [the officer] 'in a lot of trouble,' and that [the officer] should seek to extract sympathy from [the defendant] for [the officer's] pregnant wife and three children." *Id.* at 318-19. The officer did so without obtaining a confession during three separate "sessions" over the course of the interrogation. *Id.* at 319. On the fourth such attempt, which lasted an hour, the defendant confessed. *Id.* In concluding that the defendant's confession was involuntary, the *Spano* court described the use of the officer who was the defendant's childhood friend as "another factor which deserves mention in the totality of the situation." *Id.* at 323.

¶20 *Spano* does not support Kirkland's argument for a number of reasons. First, the "false friend" tactic in *Spano* was accompanied by other

coercive tactics, such as the prolonged, overnight questioning and the repeated refusals of the defendant's requests to speak with his attorney. *Id.* at 322-23. Additionally, whereas Kirkland had only ever known Rennie through Rennie's professional role as a police officer, in *Spano*, the officer was "a close friend of 8 or 10 years' standing who had attended school with [the defendant]," and who had only recently become a police officer. *Id.* at 317. Finally, in *Spano*, the officer used his relationship with the defendant to the police's advantage by falsely claiming that, because of the defendant's earlier phone call, the officer's job was at risk and that the officer's family would suffer if the defendant did not cooperate, thereby creating "sympathy falsely aroused." *Id.* at 318-19, 323. In contrast, here, the circuit court did not find that the officers relied on Rennie's relationship with Kirkland to "play on [Kirkland's] sympathies," *see id.* at 319, nor does the record suggest that this occurred. As a result, *Spano* does not assist Kirkland.

¶21 Additionally, as the State argues, as a general matter "the [Supreme] Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff." *Dassey v. Dittmann*, 877 F.3d 297, 300 (7th Cir. 2017). Further, other than *Spano*, Kirkland does not cite any case law to support her argument that Rennie and Yenter's conduct was coercive because Kirkland believed that she was meeting with Rennie to discuss the letter that she had received. And because *Spano* is not analogous to the situation here, we reject Kirkland's "false friend" argument.

¶22 Kirkland's argument is essentially that it was coercive, given the existing relationship between Kirkland and Rennie, for Rennie and Yenter not to tell Kirkland that Yenter was present because he was investigating a crime and that Rennie and Yenter would be asking Kirkland questions related to Yenter's

investigation. However, although Rennie and Yenter may not have explicitly told Kirkland about this additional purpose for setting up the interview, the interview transcript reflects that Rennie's and Yenter's questions clearly conveyed that they were investigating criminal activity, in particular, illegal methamphetamine transactions.[6]

¶23    Kirkland also argues that Yenter promised her that she would not be arrested and that her statements would not be used against her if she cooperated. During the interview, the following exchange occurred:

> DETECTIVE YENTER:  So, Devin, there is -- there is more to this that we know that you're not telling us. Okay? And now is your time to be completely honest. Okay? Because there's more. And you're giving us this much, and there's this much, if not more. Because --
>
> MS. KIRKLAND:  So am I getting arrested?
>
> LIEUTENANT RENNIE: No.  I'm not -- I told you, I'm not arresting you, and I don't lie to you; right?
>
> DETECTIVE YENTER: No. We're -- you're not getting arrested, but you need to tell us the truth.
>
> MS. KIRKLAND:  Okay.  I seriously have not done anything so …

---

[6] We also observe that Yenter's testimony suggests that he requested the interview to investigate an individual other than Kirkland:

> [T]he whole point of this conversation between myself and Miss Kirkland was [that] I was trying to gather evidence against [a different individual], and ultimately it came to the point that Miss Kirkland is basically middling quarter- and half-pound meth deals for [this other individual], and that's what this eventually turned into.

*See **Spano v. New York***, 360 U.S. 315, 324 (1959) (stating that confessions must be examined "with the most careful scrutiny" when "[t]he undeviating intent of the officers [is] to extract a confession").

DETECTIVE YENTER: So when -- those ounce, ounce and a half, levels that you were middling was early August before you went to jail?

MS. KIRKLAND: Yep.

DETECTIVE YENTER: Okay. And you've done nothing -- no middling since you got out of jail? Now is the time to be honest.

MS. KIRKLAND: So that way, it can be used against me?

DETECTIVE YENTER: Not necessarily. It might be used against someone else. It depends if you're going to cooperate or not. And --

MS. KIRKLAND: I really don't want this to bite me in the ass --

DETECTIVE YENTER: Well, it doesn't have to --

MS. KIRKLAND: -- honestly.

DETECTIVE YENTER: -- if you're -- if you're honest. The more -- the more honest and open you are that we don't have to go into details of what we know makes your case a lot better.

MS. KIRKLAND: How does that make my case better?

DETECTIVE YENTER: Because you're -- you're being honest. You're -- you're saying, this is what I'm doing for other people; other people are doing this much more.

¶24 Based on this interaction, Kirkland argues that Rennie and Yenter promised Kirkland that she "was not under arrest and would not be arrested," and that this promise was part of Rennie and Yenter's coercive conduct. We observe initially that the officers' statements appear to be ambiguous as to whether there were assurances that Kirkland was not under arrest at that time, would not be arrested during the interview, or would not ever be arrested based on what she told Rennie and Yenter. Regardless, Kirkland appears to acknowledge in her appellant's brief that whatever "promise" was made was "technically kept,"

11

although she was ultimately charged and convicted, presumably based in part on the statements obtained during the interview.[7]

¶25    However, Kirkland argues that even if kept, "well-established case law requires that promises be considered when examining the totality of the circumstances of an involuntary confession."  In support of this argument, Kirkland cites two cases:  *Hoppe*, 261 Wis. 2d 294, ¶57, and *State v. Clappes*, 136 Wis. 2d 222, 238, 401 N.W.2d 759 (1987).  Although we look at the totality of the circumstances when determining whether there was coercion, *Vice*, 397 Wis. 2d 682, ¶¶30, 31, the case law that Kirkland cites does not appear to support Kirkland's argument that Rennie and Yenter's promise, even if it was fulfilled, is significant in analyzing whether Rennie and Yenter's conduct was coercive.  The *Hoppe* court stated that "[t]here were no threats or promises" in observing that the question of voluntariness in that case was "a very difficult one."  *Hoppe*, 261 Wis. 2d 294, ¶57.  And the *Clappes* court observed that "[n]o threats or promises or attempts at physical or mental coercion were made" in the course of concluding that there was no coercion.  *Clappes*, 136 Wis. 2d at 238.  The relevant language from these cases does not support Kirkland's suggestion that a promise, even if fulfilled, is significant for purposes of determining whether there was coercion. *See also State v. Owens*, 148 Wis. 2d 922, 931, 436 N.W.2d 869 (1989)

---

[7] Kirkland argues for the first time in her reply brief that she was "ultimately arrested." However, she does not provide a record cite to support this assertion, nor does our nonexhaustive review of the record indicate that she was ever arrested, even though, as stated, Kirkland was ultimately charged.  We decline to address Kirkland's argument that she was ultimately arrested because it is raised for the first time in reply and not supported by a citation to the record. *See State v. Mata*, 230 Wis. 2d 567, 576 n.4, 602 N.W.2d 158 (Ct. App. 1999) ("We do not address issues raised for the first time in a reply brief."); *Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990) (we need not address arguments that are not supported by citations to the record).

("Although a promise was made to the defendant, it was fulfilled. Therefore, it was not part of an impermissible, coercive police tactic which could have rendered the confession involuntary."); *State v. Lemoine*, 2013 WI 5, ¶28, 345 Wis. 2d 171, 827 N.W.2d 589 ("It is not automatically unduly coercive to promise a benefit to a suspect in exchange for cooperation."). In any event, however, we will consider the officers' assurances in examining the totality of the circumstances—as we explain below, even when we consider these assurances, they do not render Kirkland's statements involuntary.

¶26    Kirkland also argues that "Yenter explicitly and falsely told Kirkland that whether her statements would be used against her depended on whether she cooperated." We disagree with this characterization of what occurred. After Yenter told Kirkland, "Now is the time to be honest," Kirkland asked whether her statements could be used against her. In response, Yenter equivocated by stating "not necessarily," and told Kirkland that the more honest she was, the better the outcome would be for her. This does not constitute coercive conduct.

> An officer telling a defendant that [the defendant's] cooperation would be to [the defendant's] benefit is not coercive conduct, at least so long as leniency is not promised. Similarly, coercive conduct does not occur when, as here, an officer, without promising leniency, tells a defendant that if he or she does not cooperate the prosecutor will look upon the case differently. In either case, the officer does nothing other than predict what the prosecutor will do, without making a promise one way or the other.

*State v. Deets*, 187 Wis. 2d 630, 636-37, 523 N.W.2d 180 (Ct. App. 1994) (citation omitted); *see also State v. Berggren*, 2009 WI App 82, ¶32, 320 Wis. 2d 209, 769 N.W.2d 110 ("[I]t is not coercive conduct for an officer to invite a defendant's cooperation by informing the defendant of potential benefits of

cooperation or to offer a prediction as to what the prosecutor will do."). As the State argues, Yenter did not lie or make any promises. In particular, contrary to what Kirkland argues, Yenter did not promise Kirkland that if she cooperated, her statements would not be used against her.

¶27 Kirkland also argues that Yenter's "false assurance" "was particularly coercive" because it implicated her Fifth Amendment rights and because Kirkland did not receive **Miranda** warnings. As stated, we disagree with Kirkland's argument that Yenter promised that Kirkland's statements would not be used against her if she cooperated. However, whether or not a defendant has received **Miranda** warnings is nonetheless relevant in determining whether there was coercion. *See* **Hoppe**, 261 Wis. 2d 294, ¶39. As we explain below, here the lack of **Miranda** warnings does not render Kirkland's statement involuntary.

¶28 Based on the foregoing, we conclude that, to the extent there was any evidence of police coercion, it was insubstantial.

*II. Kirkland's personal characteristics.*

¶29 Kirkland argues that she was particularly susceptible to police pressure as a result of her experience with law enforcement, her relationship with Rennie, and her fearful emotional condition. We address each in turn.

¶30 First, Kirkland argues that she was susceptible to police pressure because she provided information to police during prior interviews with Rennie, after which she was not prosecuted. Kirkland argues that in this way, she is like the juvenile defendant in **State v. Jerrell C.J.**, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110. In **Jerrell C.J.**, prior to the interrogation at issue in that case, the

defendant had been arrested twice for misdemeanor offenses. *Id.*, ¶29. "In both instances, he answered police questions, admitted to involvement, and was allowed to go home. Significantly, he was never adjudged delinquent." *Id.* Under those circumstances, our supreme court stated that the defendant's prior experience with law enforcement "may have contributed to his willingness to confess in the case at hand," and the court additionally noted the defendant's argument "that such an experience may have taught him a dangerous lesson that admitting involvement in an offense will result in a return home without any significant consequences." *Id.* Here, we observe that Kirkland does not argue that she made incriminating statements during her prior interviews with Rennie. We similarly observe that the caution that Kirkland demonstrated before making her incriminating statements suggests that, notwithstanding her prior interviews with Rennie, Kirkland was aware that any incriminating statements could be used against her.

¶31 Additionally, as the State notes, the defendant in *Jerrell C.J.* was fourteen years old. Our supreme court has recognized that "the condition of being a child renders one 'uncommonly susceptible to police pressures.'" *Id.*, ¶26 (quoted source omitted). Further, the defendant had an eighth-grade education and low average intelligence, and had limited experience with law enforcement. *Id.*, ¶¶26-29. We therefore disagree with Kirkland's argument that her prior contacts with Rennie are analogous to the defendant's prior police contacts in *Jerrell C.J.*, and Kirkland does not otherwise provide any case law in which analogous police contact was deemed a significant personal characteristic for purposes of determining voluntariness.

¶32     Second, Kirkland characterizes Rennie and Kirkland as having a "friendly personal relationship," and quoting *Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991), Kirkland argues that this relationship "'may well have made [Kirkland] particularly susceptible to [Rennie's] entreaties.'"  Here again, the case law that Kirkland cites in support of this argument is not on point.  In *Fulminante*, the defendant, while incarcerated, confessed to a fellow inmate—a paid FBI informant with whom the defendant had become friends—that the defendant had sexually assaulted and killed his 11-year-old stepdaughter.  *Id.* at 282-83.  The defendant confessed after the informant told him that he knew that the defendant "was 'starting to get some tough treatment and whatnot' from other inmates" based on rumors that the defendant had killed a child, and after the informant offered to protect the defendant if the defendant told him what had happened.  *Id.* at 283.  The relevant relationship in *Fulminante* is thus readily distinguishable: whereas the defendant there did not know that his friend and fellow inmate was an FBI informant, here Kirkland knew that Rennie was a police officer.  *See id.* at 283.  Additionally, in *Fulminante* the defendant's personal friendship with the FBI informant was but one of several factors that the Supreme Court noted in determining that the defendant's confession was coerced.  *Id.* at 286-87; *see also Lemoine*, 345 Wis. 2d 171, ¶3 (listing the fact that a defendant was familiar with one of the interrogating police officers as support for the conclusion that nothing about the defendant made him "particularly vulnerable").

¶33     Third, Kirkland argues that she was susceptible to police pressure because of her "fearful emotional condition."  Specifically, Kirkland argues that "[a]t the time of the interrogation, Kirkland was in a state of fear that led her to

seek Rennie's protection." However, the circuit court specifically found that Kirkland "was not fearful" during the interview.[8] Kirkland does not argue that this finding was clearly erroneous, and on that basis we reject her argument that her emotional state during the interview rendered her susceptible to police pressures. *See Hoppe*, 261 Wis. 2d 294, ¶34 ("We give deference to the circuit court's findings regarding the factual circumstances that surrounded the making of the statements.").[9] Accordingly, Kirkland fails to persuade us that she was particularly susceptible to police pressure.

### III. Balancing the officers' conduct against Kirkland's personal characteristics.

¶34 Looking at the totality of the circumstances, and balancing Rennie's and Yenter's conduct against Kirkland's personal characteristics, we conclude that Kirkland's statements were voluntary.

¶35 As to police conduct or pressure, we have concluded that, contrary to what Kirkland argues, police did not use a coercive "'false friend' approach." Moreover, although Rennie and Yenter assured Kirkland that she would not be arrested, Kirkland concedes that this promise was kept—Kirkland was not arrested that day, nor does Kirkland show that she was later arrested. Additionally, any

---

[8] Consistent with the circuit court's finding, although Kirkland met with Rennie to discuss her concerns about the perceived threats in the letter that she had received, Kirkland does not point to any evidence in the record that shows that her fears were not addressed by Rennie's assurances that there was no real threat and that Kirkland was being paranoid.

[9] The circuit court did not make explicit findings about other relevant personal characteristics, such as Kirkland's age, education, or intelligence, nor does the State or Kirkland argue that these characteristics are relevant. *See State v. Hoppe*, 2003 WI 43, ¶39, 261 Wis. 2d 294, 661 N.W.2d 407 (listing relevant personal characteristics for purposes of determining whether a statement is voluntary). We likewise do not address these characteristics.

promise made by the officers is not the type of promise that would reasonably overcome the ability of a suspect like Kirkland to resist. *See Lemoine*, 345 Wis. 2d 171, ¶28 (concluding that a promise that the defendant would not spend the night in jail, which was fulfilled, did not overcome the defendant's ability to resist). Further, Yenter did not promise Kirkland that if she cooperated her statements would not be used against her. Finally, the lack of *Miranda* warnings, although relevant, "is not dispositive, and in this case, it does not tip the scales to make [Kirkland's] statements involuntary." *See id.*, ¶33.

¶36 The circuit court found that "Kirkland came to the sheriff's department of her own accord," and that Kirkland "was told on her arrival that she was not going to be arrested, there were no handcuffs placed on her." The court noted that it had "not heard any testimony that she was in any way restrained or not allowed to leave." The court additionally found that "Kirkland was repeatedly told she was not under arrest, but that she should tell them the truth."

¶37 Regarding Kirkland's personal characteristics, as noted, Kirkland relies heavily on her prior relationship with Rennie and the fact that she went to Rennie to discuss her concerns regarding a letter she had received. To be sure, Kirkland had ongoing contact with Rennie, Kirkland would reach out to Rennie with concerns regarding her safety, and Kirkland met with Rennie based on her concerns about the letter that she had received, without knowing in advance that Yenter would be present. However, as stated, we reject Kirkland's argument that she was fearful during the interview—the circuit court found that she was not— and Kirkland does not argue that she was susceptible to coercion for reasons other than her alleged fear and her prior relationship with Rennie.

¶38 In sum, we conclude that the pressures brought to bear on Kirkland did not exceed Kirkland's ability to resist and that Kirkland's statements were therefore voluntary. *See Hoppe*, 261 Wis. 2d 294, ¶34. In other words, we conclude that the State has met its burden of establishing that Kirkland's statements were "the product of a free and unconstrained will, reflecting deliberateness of choice." *Id.*, ¶36.[10]

## CONCLUSION

¶39 For the reasons stated above, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).

---

[10] Kirkland suggests that this case is like *Hoppe*, in which our supreme court concluded that the defendant's statements were involuntary even after it observed, "We are not dealing here with egregious or outrageous police conduct. There were no threats or promises. A relatively friendly tone was used in portions of the interviews." *Hoppe*, 261 Wis. 2d 294, ¶57. We conclude that *Hoppe* is readily distinguishable. Kirkland's relevant personal characteristics are not comparable to the personal characteristics of the defendant in *Hoppe*, who "was having significant mental and physical difficulties at the time of the interviews." *Id.*, ¶47. For example, in *Hoppe*, the defendant "was suffering from cognitive impairment associated with his chronic alcoholism," "had deficits in his short-term memory and impairment of his reasoning and problem-solving abilities," "was hallucinating," and "was confabulating, meaning that he was making up for his deficits by answering questions by stating what he thought sounded correct or reasonable." *Id.*, ¶48. Nor is the conduct of Rennie and Yenter comparable to the coercive tactics employed in *Hoppe*, in which the defendant was questioned for five hours over the course of three days; the police used emotional topics, "such as the death of [the defendant's] parents, the concerns of the family of the deceased, and [the defendant's] prior military service in Vietnam," to apply psychological pressure; and the questioning was at times direct and accusatory. *Id.*, ¶¶54-55. Kirkland's comparison to *Hoppe* is therefore unavailing.